Robert C. SWITZER and Richard A. Ward, Plaintiffs,

v.

Robert C. WATSON, Commissioner of Patents, Defendant.

Civ. A. No. 185–58.

United States District Court District of Columbia.

March 31, 1960.

**468**

468Larson & Taylor, Washington, D. C.,
Ely, Pearne & Gordon, and Albert L.
Ely, Jr., Cleveland, Ohio, for plaintiffs.

Clarence W. Moore and Joseph Schimmel, United States Patent Office, Washington, D. C., for defendant.

RICH, Judge.*

This is an action pursuant to 35 U.S.C. § 145 asking the court to authorize the defendant to grant a patent to plaintiffs on their patent application, Ser. No. 484,-319, filed January 26, 1955, entitled "Penetrant Inspection Methods of Flaw Detection."

The application in suit contains five claims copied from patent No. 2,667,070 issued to Sockman and Brady January 26, 1954, plaintiffs' claims 1–5 corresponding, respectively, to claims 4, 5, 6, 7, and 9 of that patent.

The Patent Office presents two issues to the court:

(1) That Canadian patent No. 490,080 which issued January 27, 1953 and corresponds to the U. S. Sockman et al. patent, is a statutory bar under 35 U.S. C. § 102(a) or (b).

(2) That no patent can issue to plaintiffs on the application in suit because it would constitute double patenting by reason of the issuance on June 24, 1958, of patent No. 2,839,918 to Robert C. Switzer.

*(1) The statutory bar issue*

■ The resolution of this issue depends on whether the claims in suit are entitled to the filing date of a parent application, Ser. No. 606,708, filed July 23, 1945, by Ward and Switzer, of which the application in suit is a continuation-in-part. This question arises because the application in suit, which admittedly supports the claims, contains a page of disclosure (page 19) additional to what is contained in application Serial No. 606,708. Plaintiffs assert and defendant denies that the "entire page was added in the present application to point out how the seven examples (which are common to the two applications) do inherently support the claim language." Further consideration of this issue of inherency, if that is the issue, requires an understanding of the subject matter claimed.

The invention is a method of detecting surface flaws in bodies such, for example, as machine parts and involves coating the body with a dye-containing penetrant which gets into the flaws, wiping the penetrant off of the surface, depositing on the surface a so-called developer such as a suspension of talc in alcohol, letting the alcohol evaporate to leave a white absorbent film on the surface and then watching for spots of color to develop. This will happen if there has been a flaw in which some of the penetrant was trapped because the talc will absorb it and become colored by the dissolved dye, thus revealing the flaw. Plaintiffs' claim 1, which is claim 4 of the Sockman et al. patent, reads as follows:

"The method of inspecting a part for surface defects which comprises applying to a surface of said part a solution of a dye in a penetrant liquid consisting of a volatile liquid

---

* Associate Judge, United States Court of Customs and Patent Appeals, sitting by designation.

and a relatively non-violatile liquid having a higher surface tension than said volatile liquid, said relatively non-volatile liquid consisting essentially of an oxygen-containing organic liquid, removing penetrant liquid from the surface to permit evaporation of part of the volatile liquid from the penetrant liquid remaining in the defect whereby there is an increase in the surface tension of the liquid in said defect, and depositing on said surface a layer of finely divided penetrant liquid absorbing material of a color contrasting with that of said dye whereby penetrant liquid will be absorbed in said deposit to form a visible trace."

The issue here is whether this and the other similar but more limited claims are supported by the specification of the 1945 application, Serial No. 606,708. In other words, are they supported without recourse to the matter added in the application at bar? If the parent case disclosure supports the claims, then plaintiffs are entitled to its 1945 filing date and the Sockman et al. Canadian patent issued in 1953, which is the sole reference on this issue, is not a statutory bar.

The novelty of the instant invention lies not in the manipulative steps of the process but in the claimed composition of the penetrant liquid, both the steps per se and the use of "developers" being known. The penetrant liquid, as the above claim shows, is a three-component liquid. It consists of a volatile liquid, a relatively non-volatile liquid, and a dye. The non-volatile liquid must have a higher surface tension than the volatile liquid and consist essentially of an oxygen-containing organic liquid. When such a penetrant liquid is left in a surface defect such as a crack, the more volatile liquid tends to evaporate at the surface, leaving a higher proportion of the less volatile component which increases the surface tension of the penetrant. This appears to promote exudation of the penetrant from the flaw and its absorption by the developer reveals

the flaw, in a known manner, through the coloration of the developer residue by the dye.

To further develop the issue, the most specific definition of the penetrant is that contained in claim 3 (Sockman et al. claim 6) which includes the following:

" * * * a solution of a dye in a penetrant liquid consisting of 50% to 75% volatile portion having a relatively low surface tension as compared to dibutyl phthalate and from 50% to 25% of a relatively non-volatile portion consisting essentially of an oxygen-containing organic liquid having a higher surface tension than said volatile portion * * *."

Compared to claim 1, it will be observed that claim 3 is more specific in calling for percentages of volatile and non-volatile portions of the liquid and in relating the surface tension of the volatile portion to that of dibutyl phthalate, a compound used by Sockman et al. but not mentioned in plaintiffs' 1945 application. At the same time the language is different in that claim 1 refers to a penetrant liquid consisting of a volatile and a non-volatile *liquid,* whereas claim 3 refers to the volatile and non-volatile *portions* of the penetrant liquid. In this particular, claim 2 is like claim 1 and claims 4 and 5 are like claim 3. I mention this difference in connection with a point made by the board that under plaintiffs' claims the second liquid component *"must be liquid* prior to compounding the penetrant liquid which includes both liquids." [Emphasis mine.] Certainly there is no such requirement to be found in claims 3, 4, and 5. As plaintiffs have pointed out, the claims do not call for oxygen-containing organic *compounds* and a *liquid* meeting the claim limitations could consist of a solid compound dissolved in a solvent. Nor do I see that claims 1 and 2 which call for a "relatively non-volatile liquid consisting essentially of an oxygen-containing organic liquid" impose any such requirement. This is a minor matter, however,

in view of the main issue in this phase of the case, the disposition of which renders it unimportant. But it is necessary to know that the board did take that position on the construction of the claim language.

A great deal of confusion seems to have been engendered in the prosecution of the application in suit by an apparent assumption on the part of the Patent Office that the applicants were relying on page 19 of the instant application, which was added to the disclosure of the 1945 parent application and about which questions arose as to whether it was "new matter." An interference was declared with the Sockman and Brady U. S. patent No. 2,667,070 which is the counterpart of the Canadian patent asserted as an alleged statutory bar. Sockman et al. moved to dissolve and the primary examiner granted the motion on the ground that applicants could not rely on the 1945 application and hence Sockman et al. foreign patents issued more than a year before the filing of the instant application were statutory bars, making the counts unpatentable to the applicants. The examiner stated that the added matter on page 19 "forms the basis for the proposed counts for interference as set forth in claims 1 to 5 of this case." In the *ex parte* prosecution following dissolution of the interference the applicants were in the position of trying to persuade the examiner to reverse the decision made in the interference that they were not entitled to the 1945 filing date. Naturally, he declined to do so. He reiterated that his reasons had been stated in the interference but in his "Final" action he undertook to summarize their "salient features." I quote them to show some of the errors in his thinking. He said:

> "The phrase 'oxygen-containing liquid['] warrants emphasis as it is the crux of the claim. The phrase does not refer to a trace of oxygen such as air that may be found in water, or in bubbles that may be found in oils, but it refers to oxygen as an ingredient of the compound. There is *no statement* in the Ward et al parent case Serial No. 606,708 that the ingredients added to the penetrant oil are oxygen containing. Furthermore the parent case Serial No. 606,708 *fails to teach the fact* that the ingredients are relatively non-volatile and consist essentially of an oxygen containing compound. While some of the emulsifying agents of the parent case may *inadvertently* contain oxygen, they do not *'consist essentially* of an oxygen containing liquid' as called for in the instant claims. The term 'consisting' is limitative and excludes other ingredients Ex parte Rawles 390 O.G. 707." [My emphasis except the last.]

This was in reply to the contention that the seven examples of penetrant liquids in the parent case, which are identical with the seven examples in the instant application, met the terms of the copied claims. The question was, and is, whether they do in fact, not whether the specification *said* that an oxygen-containing liquid contained oxygen, or *taught* that a relatively non-volatile liquid was relatively non-volatile. What is meant by "inadvertently" containing oxygen is not clear. Oxygen-containing compounds do not contain their oxygen inadvertently.

On appeal to the Board of Appeals the applicants met with similar reasoning. After briefly reviewing the nature of the disclosure of the parent application, the board said:

> "There is no reference to be found in the earlier application, Serial No. 606,708 to the relatively [sic] volatility of the components of the testing agents or a recognition that the invention must include a second liquid, * * * or that the penetrant liquid is removed from the surface to permit evaporation of part of the volatile liquid. Clearly nothing is found in the earlier application to support the specific limitation in claim 3 that the 'volatile

portion' has a relatively low surface tension as compared to dibutyl-phthalate as called for in that claim. * * * All these limitations are *mentioned for the first time* on page 19 of the specification of the present application. [My emphasis.]

\* \* \* \* \* \*

" * * * there is nothing in the earlier application to indicate that in order to obtain the composition covered by the claims, the differences in volatility and other limitations as set out in the claims be observed, and *the fact that some of the examples might be construed as falling within their terminology is not sufficient.*" [My emphasis.]

The only authority cited by the board at that point was In re Frevert et al., 119 F.2d 437, 440, 28 CCPA 1128. That was an appeal from the refusal of a reissue patent and is distinguishable on its facts. Being for a reissue, it also involved different law, it being necessary that the reissue claims be for the same invention as that originally claimed. The court held that what was claimed "was not only not disclosed in appellants' patent, but obviously was not intended to be claimed therein." The only question we have here is whether the subject matter of claims 1–5 is or is not disclosed in the 1945 parent case. We are not concerned with what the applicants then intended to claim. This has nothing to do, furthermore, with what is on page 19 of the application in suit. The place we have to look is in the specification of the parent case, Serial No. 606,708.

The position of the board, which it made doubly clear in a second opinion on a petition for reconsideration, was that the applicants' claims do not read on their parent case because (1) the second liquid component of the penetrant liquid must be a liquid prior to compounding and (2), in the board's own words, "It is obvious that all the emulsifying agents disclosed by appellants in the parent case are not liquids." Does this mean not all are liquids or none are liquids? First,

to clear up the ambiguity, the board later explained that it meant the *majority* are solids. Secondly, to explain the significance of the applicants' "emulsifying agents," to which the board referred, it is as follows.

As applicants conceived their invention in 1945, with respect to the embodiments pertinent here, their testing agents were water-emulsifiable compositions that could be wiped on parts to be tested for flaws and washed off with water, leaving some penetrant, of course, in the flaws to show them up when a developer was applied. Such materials they made from "a water-insoluble oil or like liquid; it may be a single petroleum or hydrocarbon fraction or a number of them proportioned to give the penetrant good metal wetting characteristics, low surface tension, low volatility, suitable viscosity, and proper solvent power for the other constituents." There is no dispute over this ingredient, which corresponds to the *volatile* liquid or portion of the claims in suit. What I have just quoted is common to the application in suit and the parent specification. The second ingredient is the coloring material and there is no dispute about support for it. The third ingredient is the emulsifying agent and the parent specification describes it thus:

"The emulsifying agent is usually composed of one or more oil-soluble soaps, detergents, or other surface-tension reducing agents which render the testing agent 'self-emulsifying', that is, the testing agent will emulsify directly in water; in some instances it may be expedient to employ soaps or detergents which are not in themselves oil-soluble but which may be held in solution by a mutual solvent or coupling agent (often an alcohol) for the actual emulsifier and the oil; for the purposes of this invention, such mutual solvents or coupling agents may simply be considered a part of the emulsifying agent."

So much for the general description of emulsifying agents, but plaintiffs do not

rely on this. They rely on seven specific examples which are thereafter set forth in the specification in which the emulsifiers are, by example number:

| | Emulsifier | % by weight |
|---|---|---|
| 1. | Naphthenic acid soap (molecular weight about 350) | 16.7 |
| 2. | Octylaminoethanol soap of tetradecyl sulfuric acid | 22. |
| 3. | Tri (diethylene glycol ether) of sorbitol trioleate | 2. |
| 4. | Sodium salt of mahogany acid | 50. |
| 5. | Sodium dodecyl benzenesulfonate 18% and cyclohexanol 27% | 45. |
| 6. | Naphthenic acid soap | 16. |
| 7. | Refined sulfonated aromatic petroleum fractions (approximate empirical formula: $C_{26}$ $H_{25}$ $SO_3$ $Na$; approximate molecular weight: 430) | 3. |

At the trial in this suit, to refute the board's unsupported assertion that "all the emulsifying agents * * * are not liquids," plaintiffs put a chemist on the stand who described the foregoing agents, introduced samples of each, testified that each was a liquid, demonstrated that each was a liquid, stated their surface tensions and that each is organic and oxygen-containing. This testimony was not contradicted during the trial.[1] The six different liquids used as emulsifiers in the seven examples vary considerably in viscosity, from that of common mineral oil to the consistency of mayonnaise but clearly none is a solid and I hold that all are liquids by common as well as technical definitions of the term "liquid." One further observation is required with respect to the material in Example 5. Plaintiffs admit that the cyclohexanol in the cyclohexanol-sodium dodecylbenzene sulfonate solution is solid at room temperature. Nevertheless, the emulsifying *agent* as used is certainly a liquid and both of its constituents are organic, oxygen-containing compounds.

On the basis of the evidence I hold that the limitation of the appealed claims calling for an oxygen-containing organic liquid as a constituent of the penetrant liquid is fully supported in the parent specification Serial No. 606,708.

Adverting to the examiner's objection that there was no "statement" in application 606,708 that the ingredients are oxygen-containing, I note the fact that neither is there any such statement in the Sockman et al. patent wherein the claims containing that limitation originated. All those patentees did was to disclose a group of organic compounds which *do* contain oxygen, give a single specific example of a penetrant liquid containing ethylene glycol monobutyl ether and dibutyl phthalate, and then claim oxygen-containing organic liquids broadly as the relatively non-volatile portion. Plaintiffs' parent application disclosure is as adequate to support this claim limitation. Sockman et al. had the *concept* of using materials known in the plastics art as "plasticizers." Plaintiffs' corresponding ingredients were known to and used by them as "emulsifiers." But Sockman et al. having obtained broad claims including *all* organic oxygen-containing liquids, which read on the examples of plaintiffs' parent case, it seems clear to me that plaintiffs have every

[1]. The Patent Office Solicitor annexed to his brief photostats of two pages from chemical texts in support of his further instance that naphthenic acid soaps are solids, contrary to the testimony that those used by plaintiffs were liquids as shown by an exhibit in evidence. Plaintiffs, properly I think, object to this attempt to inject further evidentiary matter and have countered with an affidavit of the witness contradicting the solicitor's factual conclusions based on the texts. Such matters are improperly introduced after the close of the trial and I have ignored them.

right to copy those claims and to contest the right of Sockman et al. to them, regardless of the different approaches which Sockman et al. and the plaintiffs made, according to their initial concepts of their inventions. The error of the Patent Office, it seems to me, was in looking to the conceptual approaches of the rival inventors rather than the concrete end results.

As to the relative volatility limitation of the claims, in each of the seven specific examples of plaintiffs' parent case the emulsifier or oxygen-containing organic liquid is less volatile than the penetrant oil. And the non-volatile liquid in each case has a higher surface tension than the volatile liquid. As to claim 3, wherein the surface tension of the volatile portion is low "as compared to dibutyl phthalate," this is a fact which either exists or does not exist with respect to any given material. All one needs to find in the parent case is a material meeting that specification. Plaintiffs' chemist witness established to my satisfaction that the surface tension of each of the volatile liquids in plaintiffs' seven examples is "low as compared to dibutyl phthalate." The latter, he testified, has a surface tension of 37.1 dynes/$cm^2$ and the surface tensions of the volatile liquids ranged from a low of 29.0 to a high of 31.9.

The only remaining limitation to be checked out as disclosed in the parent case is the percentage relation of the volatile and non-volatile liquid portions of the penetrant liquid. Claim 2 calls for 50% to 75% of a volatile "liquid" with the balance non-volatile and claim 3 is similar except that the non-volatile "portion" is also specified as from 50% to 25%, which is another way of saying the same thing. No particular argument has been made about these proportions,

but I find that they are met by Example 5 where the volatile, kerosene, is 53% and the non-volatile is the material specified above in the table in the amount of 45%, the balance being color. It is also substantially met by Example 4 which has 49% kerosene and 50% sodium salt of mahogany acid.

On issue (1), supra, I hold, on the basis of the foregoing findings, that plaintiffs are entitled to rely as to all of claims 1–5 on the filing date of application Serial No. 606,708 and that the Canadian patent to Sockman et al. is, therefore, not a statutory bar. The contrary decision of the Board of Appeals is inconsistent with the facts and contrary to law. The procedural law which governs here is as stated in Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App.D.C. 154, 159, 229 F.2d 37, 42;

> "Of course, if the decision of the Patent Office is not warranted on the evidence before it, or if the new evidence reaches the necessary standard, the District Court may rule as the totality of the evidence may require."

The positive evidence in this court in my judgment overcomes the erroneous speculations of the Patent Office Board of Appeals as to the controlling facts.

### (2) Double Patenting

■ This issue was sprung on the plaintiffs in this court at the opening of the trial. The issue being based on Patent No. 2,839,918 issued to the plaintiff Switzer, the situation was, as plaintiffs' counsel said, that he was surprised but not astonished. He was familiar with the circumstances but had no notice of the defense.[2]

In view of the nature of an action under 35 U.S.C. § 145, which asks the court to *authorize* the Commissioner of

2. Plaintiffs' counsel should be accustomed to double patenting defenses. The application for the very patent relied on was also involved in a suit under Sec. 145 in this court and the Court of Appeals, the same attorneys representing the parties, and a double patenting issue was present. Switzer v. Watson, 102 U.S.App.D.C. 145, 251 F.2d 386. The 1945 parent application went on an appeal to the C.C.P.A. with another double patenting issue. See In re Ward and Switzer, 236 F.2d 428, 43 CCPA 1007.

Patents to issue a patent, the defense was heard and permission given to amend the Answer to plead it. Knowing that a complete defense against granting a patent *may* exist, the court cannot conscientiously authorize the grant of a patent without looking into it. Nevertheless, the sporting theory of justice went out when the Federal Rules of Civil Procedure came in and it is only fair that the Patent Office should give notice to plaintiffs of such additional defenses as far ahead of trial as possible and at least as soon as it has been decided to present them. I recently had occasion to comment on a similar situation in Harpman v. Watson, D.C., 181 F.Supp. 919. Patent No. 2,839,918 issued on June 24, 1958, six months after the complaint in this action was filed. It states that it, too, is a continuation-in-part of the 1945 parent application, Serial No. 606,708. As of that date, presumably, the Patent Office was fully cognizant of the whole picture.

Since this defense arose in this court, there are no findings or decisions on it below. It would seem, in consequence, that no presumption of administrative correctness attaches to the contentions of the Patent Office Solicitor under the familiar Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, line of cases. Furthermore, the ruling of this court on double patenting depends only on the construction of legal documents, the prior Switzer patent relied on and the application in suit, and no question of Patent Office expertness is involved.

Patent No. 2,839,918 contains two claims, claim 1 reading:

"In a method of detecting the presence of flaws in the surface layers of a metallic article, the steps comprising applying to the surface of said article a solution containing an oil and a coloring material, maintaining the solution in contact with the surface for a period of time of sufficient duration that the solution may penetrate said flaws, removing from the surface the solution which has not penetrated said flaws, and applying to the surface a finely divided absorbent material, the presence of flaws in the surface layers of said metallic article being visibly indicated by a coloring of the absorbent material lying adjacent said flaws by the coloring material contained in the solution upon the seeping of the latter out of said flaws onto the surface of the article."

Claim 2 differs in calling for "a penetrating oil and an oil soluble dye" instead of "an oil and a coloring material," in specifying "several minutes" as the time it is left on the surface, and in saying the color of the absorbent material contrasts with the color of the dye. (These two claims are said to have been awarded to Switzer in an interference with Bloom et al. patent No. 2,420,646 and to have been copied from that patent.)

In urging that the allowance of the claims in suit would constitute "double patenting" the Patent Office puts great stress on the fact that the claims define processes in which the manipulative steps are the essential features. The similarity, if not the identity, of these steps is urged. This but obscures the true issue. Elsewhere, on the other issue, the board and the Patent Office Solicitor have both emphasized the fact that, quoting the board, "the novelty of the present invention resides in the particular composition of the penetrant liquid." Looking to this aspect of the claims, it is clear that the claims in suit are directed to a quite different invention from the simple "solution containing an oil and a coloring material" or "solution containing a penetrating oil and an oil soluble dye" of Switzer patent No. 2,839,918, in that they define the specifically different invention described in claim 1 of the application (Sockman et al. claim 4) as "a solution of a dye in a penetrant liquid consisting of a volatile liquid and a relatively non-volatile liquid having a higher surface tension than said volatile liquid, said relatively nonvolatile liquid consisting essentially of an oxygen-containing organic liquid."

**475**

The Patent Office Solicitor has not pointed out why these are not distinct inventions capable of supporting two patents. He argues on this branch of the case that the Switzer patent relied on and the parent case, Serial No. 606,708, have identical disclosures and that the claims differ merely in scope and "cover" the same subject matter. To this there are several answers. What the claims "cover," in the sense of what would infringe them, is not the determining factor but rather what inventive concepts they define. If it is the Patent Office position that the claims in suit here are for the *same invention* as claims 1 and 2 of the Switzer patent, there seems to be an inconsistency in issuing the patent and thereafter contending in this case, as has been done on issue (1) discussed above, that the claims (to what is *allegedly* the same invention) are not supported by the specification which is substantially identical with that of the issued patent. Finally, as plaintiffs point out, while the argument is that the claims are based on but one common specification, the two claims of the Switzer patent originated in and were copied from Bloom et al. patent No. 2,420,646 and the claims here originated in and were copied from Sockman et al. patent No. 2,667,070 and allowed therein over said Bloom et al. patent cited as a reference. That both sets of claims now find support in the disclosures of a common specification proves nothing. Specifications frequently disclose a plurality of inventions claimable in separate patents. In fact the parent specification under consideration clearly describes at least two distinct inventions under two separate headings, "Non-Emulsification Techniques" and "Emulsification Technique." The Switzer patent claims find support in the former, the claims in suit only in the latter, to which all of the specific examples discussed above are directed.

I hold that the claims in suit, if contained in an issued patent, would not constitute double patenting in view of the claims of Switzer patent No. 2,839,918.

I have thought it best to dispose of the double patenting issue by holding that this defense is lacking in merit, although plaintiffs' brief suggests that the amendment to the answer raising this defense, filed in accordance with permission granted at the trial, should be stricken. However, had my conclusion on this defense, on the evidence now in the record, gone against plaintiffs, I would have felt that they were entitled to an opportunity to present other evidentiary matter alleged to exist to counter this defense, of which they had no notice prior to trial.

This opinion contains the court's findings of fact and conclusions of law. Plaintiffs may have judgment authorizing the Commissioner of Patents to issue a patent on claims 1–5, on compliance with the requirements of law. Submit order.